UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

WILLIAM CALLAS, THOMAS CASSESE, and
NATALIE FERD,

Plaintiffs,

- against -

S&P GLOBAL INC.,

Defendant.

-----------------------------------------------------------------X

Case No.

**COMPLAINT**

**PLAINTIFFS DEMAND
A TRIAL BY JURY**

Plaintiffs, WILLIAM CALLAS, THOMAS CASSESE, and NATALIE FERD by their attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complain of Defendant, as follows:

### NATURE OF THE CASE

1. Plaintiffs bring this action alleging that Defendants have violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132, *et seq.*, ERISA §§ 502, *et seq.*, as amended, Plaintiffs seek damages, as well as injunctive and declaratory relief, to redress the injuries they have suffered.

### JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES

2. Jurisdiction of this Court is proper under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides and does business in this District, and a

|   |   |
|---|---|
|   | substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District. |
| 4. | Plaintiffs are properly joined in this action pursuant to Fed. R. Civ. P. 20(a)(1) as question of law and fact common to each arise in this action. |
| 5. | Each Plaintiff has exhausted all internal remedies under the Defendants' relevant benefits plan. |

## THE PARTIES

| | |
|---|---|
| 6. | At all times relevant hereto, Plaintiff WILLIAM CALLAS ("CALLAS") is a resident of the State of New York and County of Suffolk. |
| 7. | At all times relevant hereto, Plaintiff THOMAS CASSESE ("CASSESE") is a resident of the State and County of Bronx. |
| 8. | At all times relevant hereto, Plaintiff NATALIE FERD ("FERD") is a resident of the State and County of Kings. |
| 9. | Plaintiff Callas, Plaintiff Cassese, and Plaintiff Ferd are collectively referred to herein as "Plaintiffs." |
| 10. | At all times relevant hereto, Defendant S&P GLOBAL, INC. ("S&P"), formerly McGraw Hill Financial, Inc., was and is a domestic for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of New York. Defendant S&P is headquartered at 55 Water Street, New York, 10041 |
| 11. | At all times relevant hereto, S&P Global Market Intelligence Inc. was and is a subsidiary of Defendant S&P with its headquarters at 148 Princeton-Hightstown Road, Hightstown, New Jersey 08520. |
| 12. | At all times relevant hereto, Standard & Poor's Security Evaluations was and is a |

subsidiary of Defendant S&P with its headquarters at 148 Princeton-Hightstown Road, Hightstown, New Jersey 08520.

## FACTS MATERIAL TO ALL PLAINTIFFS

13. Defendant S&P has a severance plan in place by which all Plaintiffs are covered, the The Separation Pay Plan of S&P Global Inc., formerly known as the Separation Pay Plan of McGraw Hill Financial, Inc. (hereinafter the "Plan").

14. The Plan is subject to ERISA.

15. Under the terms of the Plan, covered employees are entitled to two weeks of severance pay for each year of continuous service, with a minimum payment equal to twelve weeks of pay.

16. The Plan mandates a three-week minimum notice period in the event of involuntary termination of an employee with less than five years of continuous service. Employees are entitled to one week of pay for each week that they were entitled to notice but were not given such notice.

17. The Plan mandates a six-week minimum notice period in the event of involuntary termination of an employee with more than ten years of continuous service. Employees are entitled to one week of pay for each week that they were entitled to notice but were not given such notice.

18. Covered employees may receive these benefits if they are deemed to be "involuntarily terminated" as defined by the Plan.

19. The Plan defines "Involuntary Termination" as a termination resulting from (i) a reduction in force, (ii) a job relocation or elimination, (iii) a job outsourcing, (iv) the conversion of your temporary layoff to a permanent layoff or (v) such other circumstance

specified in writing on a case-by-case basis by the Plan Administrator.

20. In or about mid-2015, Defendant S&P acquired SNL Financial ("SNL"). On information and belief, soon after this acquisition, numerous employees of Defendant S&P were displaced by incoming SNL employees.

21. On information and belief, Defendant S&P structured a scheme to terminate Defendant S&P employees for pretextual "cause" to replace them with SNL employees who were, on a whole, paid less compensation than Defendant S&P employees, so as to avoid compensating said employees severance pay for Involuntary Termination as outlined and required under the Plan.

22. Plaintiffs were among the group of employees so affected.

## FACTS MATERIAL TO PLAINTIFF CALLAS

23. Plaintiff Callas filed a claim for unpaid benefits with the Claims Review of Defendant S&P on April 20, 2017.

24. The Claims Reviewer denied Plaintiff Callas' claims by letter dated June 8, 2017, which was received by Plaintiff Callas on June 14, 2017.

25. Plaintiff Callas submitted an appeal to the Appeal Reviewer on August 14, 2017.

26. On February 16, 2018, Defendant S&P denied Plaintiff Callas' appeal, confirming Defendant S&P's denial of Plaintiff Callas' benefits under the Plan.

27. Plaintiff Callas began his employment with Defendant S&P in or about November 2017. Plaintiff Callas was hired to run the Operations and Reliability Group.

28. In 2014, Plaintiff Callas performed all of the duties in an exemplary manner. At the end of his first year of employment, he received an above average rating. Plaintiff Callas was considered a top talent in the company by various supervisors.

4

29. Defendant S&P had a program named Program Noble which had four main projects referred to as "Pillars." Plaintiff Callas was entrusted by Defendant S&P to be a critical sponsor for three of the four projects.

30. Plaintiff Callas performed his work on Program Noble in an exemplary manner.

31. When Defendant acquired SNL in mid-2015, numerous staff at Plaintiff Callas' level were displaced by incoming SNL employees.

32. In or about November 2015, Plaintiff Callas was asked to provide capability to support a significant deal with Morgan Stanley. On information and belief, Plaintiff Callas was given this responsibility due to his strong work performance during his tenure with Defendant S&P.

33. At the end of 2015, Plaintiff Callas was given a performance appraisal of "achieved/average."

34. Plaintiff Callas was then unexpectedly terminated by Defendant S&P in April 2016.

35. Plaintiff Callas had no prior knowledge that he was about to be terminated by Defendant S&P.

36. Prior to his termination, Plaintiff Callas received no write-ups, disciplinary memos, or other such documentation stating in any way that he had performance issues.

37. Plaintiff Callas was never placed on a "performance improvement plan," which is standard practice with underperforming employees at Defendant S&P.

38. At no time until his termination was Plaintiff Callas ever told by anyone at Defendant S&P that his position was in jeopardy.

39. Just one week prior to his termination, Plaintiff Callas was presented with a Long-Term Incentive Plan by Defendant S&P, which would award him $80,000 and increase to a

total of $180,000 after four years of employment.

40. Plaintiff Callas' termination coincided with multiple layoffs of Defendant S&P employees after Defendant S&P acquired SNL. On information and belief, the terminated employees of Defendant S&P were almost always replaced by SNL hires who were paid less than the terminated S&P employees.

41. On information and belief, most of the Defendant S&P staff that were terminated worked in the New York City office and were replaced by employees working in Virginia and Colorado.

42. Upon information and belief, Defendant S&P's allegations of poor performance were pre-text for terminating Plaintiff Callas for cause to avoid compensating him in accordance with the Plan for involuntary termination.

43. Upon Information and belief, Defendant S&P used unwarranted performance reviews to terminate and replace employees, including Plaintiff Callas, with employees who were compensated less and/or were outside of New York City.

## FACTS MATERIAL TO PLAINTIFF CASSESE

44. Plaintiff Cassese filed a claim for unpaid benefits with the Claims Reviewer of Defendant S&P on May 26, 2017.

45. The Claims Reviewer denied Plaintiff Cassese's claims by letter dated August 24, 2017, which was received on August 28, 2017.

46. Plaintiff Cassese submitted an appeal to the Appeals Reviewer on October 26, 2017.

47. On June 13, 2018, Defendant S&P denied Plaintiff Cassese's appeal, confirming Defendant S&P's denial of Plaintiff Cassese's benefits under the Plan.

48. Plaintiff Cassese began working for Defendant S&P Global in 1998 and continued for

eight years during which he was promoted through various positions.

49. In 2002, Plaintiff Cassese received a Silver Ace Award for outstanding customer service.

50. In 2003, Plaintiff Cassese received a Gold Ace Award for outstanding customer service.

51. In January 2007, Plaintiff Cassese voluntarily left Defendant S&P for a position with Fitch Ratings.

52. In December 2007, Defendant S&P offered Plaintiff Cassese a position to return to the firm, and in July 2008, Plaintiff Cassese accepted and returned to Defendant S&P as an associate director.

53. Defendant S&P and Plaintiff Cassese had an agreement that upon returning to Defendant S&P in 2008, Plaintiff Cassese's start date with the company would be 1998 for all purposes.

54. During his second stint with Defendant S&P, Plaintiff Cassese received continued praise from his managers and was promoted.

55. Prior to 2016, Plaintiff Cassese received all positive performance evaluations, including a score of "Target" at the end of 2015.

56. In 2015, Defendant S&P acquired SNL and began making numerous staffing changes throughout their New York office

57. On information and belief, Plaintiff Cassese, along with many other co-workers in this department in the New York office, were suddenly given nonsensical poor performance reviews.

58. Plaintiff Cassese's 2016 mid-year performance review attempted to backtrack that his 2015 "Target" score, which meant Plaintiff Cassese met all expectations, was given to Plaintiff Cassese despite the fact that he was told of performance issues.

59. This 2016 Mid-Year review was the lowest scored review Plaintiff Cassese had ever received in his nineteen-year career with Defendant S&P.

60. Defendant S&P provided no reason why it did not put Plaintiff Cassese's alleged poor performance on his 2015 evaluation when it seemingly had no issue alleging performance issues in 2016.

61. In this 2016 evaluation, Defendant S&P alluded to vague performance issues such as Plaintiff Cassese being "unengaged" and having communication issues.

62. Plaintiff Cassese did not receive any written criticisms or emails stating that his performance was below expectations prior to the 2016 performance evaluation.

63. In 2017, Plaintiff Cassese was approved for, and went out on, leave under the Family Medical Leave Act for five weeks. The Mid-Year review makes direct reference to Plaintiff Cassese taking leave and on information and belief, inferred that this was a reason as to why he was allegedly unengaged.

64. Multiple statements contained in the Mid-Year Review are false, for example, the review alleged that Plaintiff Cassese neglected a program which was actually completed by Plaintiff Cassese and a co-worker.

65. In September 2016, Defendant S&P gave Plaintiff Cassese a final warning. However, on information and belief, there is no documentary evidence that Plaintiff Cassese had been performing poorly outside of his Mid-Year Review.

66. Plaintiff Cassese was terminated in December 2016.

67. Upon information and belief, Plaintiff Cassese's replacement earns significantly less compensation than Plaintiff Cassese.

68. Upon information and belief, Defendant S&P's allegations of poor performance were pre-

8

text for terminating Plaintiff Cassese for cause to avoid compensating him in accordance with the Plan for involuntary termination.

69. Upon Information and belief, Defendant S&P used unwarranted performance reviews to terminate and replace employees, including Plaintiff Cassese, with employees who were compensated less and/or were outside of New York City.

## FACTS MATERIAL TO PLAINTIFF FERD

70. Plaintiff Ferd filed a claim for unpaid benefits with the Claims Reviewer on May 26, 2017.

71. Th Claims Reviewer denied Plaintiff Ferd's claims by letter date August 24, 2017, which was received on August 28, 2017.

72. Plaintiff Ferd submitted an appeal to the Appeal Reviewer on October 26, 2017.

73. On June 13, 2018, Defendant S&P denied Plaintiff Ferd's appeal, confirming Defendant S&P's denial of Plaintiff Ferd benefits under the Plan.

74. Plaintiff Ferd was hired by Defendant S&P on or about February 27, 2002. She worked for the company for nearly fifteen-years, until her termination on or about January 18, 2017.

75. Plaintiff Ferd worked in the Internal Technology ("IT") department.

76. On every performance review that Plaintiff receive, with the lone exception of her 2016 review, she given either "exceeds" expectations of "meets" expectations by Defendant S&P.

77. Throughout Plaintiff Ferd's nearly fifteen-year tenure, she was tasked with working on multiple high-level projects, including Maintain Bond, KDBS, Securities Date Management, Ratings Press, Project Gateway, NIIDS, and Dalcomp.

78. During the years between 2006 to 2009, Plaintiff Ferd was tasked with implementing an "Associated Obligor" feature in the Maintain Bond and SDM systems. Her efforts in this task were highly praised by senior management personnel.

79. From 2012 and 2015, Plaintiff Ferd was given responsibility for working on three new applications: Ratings Xpress, Crosswalk, and Product Gateway. These responsibilities were in addition to her current responsibilities with SDM. On information and belief, Plaintiff Ferd was given these additional responsibilities due to her competence and work ethic.

80. Plaintiff Ferd never received any criticism of her work, nor was she ever given any warnings or subjected to any disciplinary actions prior to 2016.

81. In or around July 2015, Defendant S&P acquired SNL and wholesale changes began to be made throughout the organization. Part of these changes were the explicit direction by the company to lower the IT staff presence in North America and replace them with workers in India and Pakistan.

82. Subsequent to Defendant SP's directive, Plaintiff Ferd was suddenly placed on a performance improvement plan in March 2016. This was the first negative feedback of her work that Plaintiff Ferd had received in fourteen years working for the company.

83. On or about November 16, 2016, Plaintiff Ferd was given a Final Written Performance Warning. This warning was vague and ambiguous and purported deficiencies in Plaintiff Ferd's performance such as "focus and accountability on assigned tasks" and "understanding the current system." Nowhere in this warning was there any mention of any specific project or task that Plaintiff Ferd performed in an unsatisfactory manner.

84. Plaintiff Ferd responded by email to the Final Warning, explicitly refuting Defendant

S&P's allegations.

85. On December 12, 2016, Plaintiff Ferd received an email from management listing alleged deficiencies with her work. Plaintiff Ferd immediately responded by email with evidence directly refuting the alleged deficiencies.

86. Defendant S&P did not respond to this email.

87. On January 18, 2017, Defendant S&P terminated Plaintiff Ferd's employment.

88. Upon information and belief, Defendant Ferd's job duties were replaced by employee(s) located outside of New York.

89. Upon information and belief, Defendant S&P's allegations of poor performance were pre-text for terminating Plaintiff Ferd for cause to avoid compensating her in accordance with the Plan for involuntary termination.

90. Upon Information and belief, Defendant S&P used unwarranted performance reviews to terminate and replace employees, including Plaintiff Ferd, with employees who were compensated less and/or were outside of New York City.

## AS A FIRST CAUSE OF ACTION
## FOR DENIAL OF BENEFITS UNDER ERISA
## (Plaintiff Callas Against Defendant)

91. Plaintiff Callas repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

92. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan and to enforce his rights under the terms of the plan.

93. ERISA defines an "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an

11

employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services."

94. The Separation Pay Plan of S&P Global Inc., formerly known as the Separation Pay Plan of McGraw Hill Financial, Inc., meets the definition of an "employee welfare benefit plan" under ERISA.

95. Defendant S&P recognizes the Plan to qualify as a plan under ERISA.

96. Under the terms of the Plan, covered employees are entitled to two weeks of severance pay for each year of continuous service, with a minimum payment equal to twelve weeks of pay.

97. The Plan mandates a three-week minimum notice period in the event of involuntary termination of an employee with less than five years of continuous service. Employees are entitled to one week of pay for each week that they were entitled to notice but were not given such notice.

98. Covered employees may receive these benefits if they are deemed to be "involuntarily terminated" as defined by the Plan.

99. The Plan defines "Involuntary Termination" as a termination resulting from (i) a reduction in force, (ii) a job relocation or elimination, (iii) a job outsourcing, (iv) the conversion of your temporary layoff to a permanent layoff or (v) such other circumstance specified in writing on a case-by-case basis by the Plan Administrator.

100. Defendant S&P owes Plaintiff Callas benefits under the terms of the Plan.

101. Defendant S&P failed to compensate Plaintiff Callas for involuntary termination under the terms of the Plan.

102. As described more fully above, Defendant S&P engaged in a scheme to pre-textually allege poor performance of employees, including Plaintiff Callas, to terminate the employee for cause and avoid having to compensate the employee under the Plan the required compensation for employees who are "involuntarily terminated."

103. As described above, Defendant S&P alleged false poor performance to avoid compensating Plaintiff Callas for "involuntary termination" under the Plan in violation of ERISA.

## AS A SECOND CAUSE OF ACTION
## FOR DENIAL OF BENEFITS UNDER ERISA
## (Plaintiff Cassese Against Defendant)

104. Plaintiff Cassese repeats and reallege each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

105. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan and to enforce his rights under the terms of the plan.

106. ERISA defines an "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness,

accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services."

107. The Separation Pay Plan of S&P Global Inc., formerly known as the Separation Pay Plan of McGraw Hill Financial, Inc., meets the definition of an "employee welfare benefit plan" under ERISA.

108. Defendant S&P recognize the Plan to qualify as a plan under ERISA.

109. Under the terms of the Plan, covered employees are entitled to two weeks of severance pay for each year of continuous service, with a minimum payment equal to twelve weeks of pay.

110. The Plan mandates a six-week minimum notice period in the event of involuntary termination of an employee with more than ten years on continuous service. Employees are entitled to one week of pay for each week that they were entitled to notice but were not given such notice.

111. Covered employees may receive these benefits if they are deemed to be "involuntarily terminated" as defined by the Plan.

112. The Plan defines "Involuntary Termination" as a termination resulting from (i) a reduction in force, (ii) a job relocation or elimination, (iii) a job outsourcing, (iv) the conversion of your temporary layoff to a permanent layoff or (v) such other circumstance specified in writing on a case-by-case basis by the Plan Administrator.

113. Defendant S&P owed Plaintiff Cassese benefits under the terms of the Plan.

114. Defendant S&P failed to compensate Plaintiff Cassese for involuntary termination under the terms of the Plan.

115. As described more fully above, Defendant S&P engaged in a scheme to pre-textually

allege poor performance of employees, including Plaintiff Cassese, to terminate the employee for cause and avoid having to compensate the employee under the Plan the required compensation for employees who are "involuntarily terminated."

116. As described above, Defendant S&P alleged false poor performance to avoid compensating Plaintiff Cassese for "involuntary termination" under the Plan in violation of ERISA.

## AS A THIRD CAUSE OF ACTION
## FOR DENIAL OF BENEFITS UNDER ERISA
## (Plaintiff Ferd Against Defendant)

117. Plaintiff Ferd repeats and reallege each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

118. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan and to enforce his rights under the terms of the plan.

119. ERISA defines an "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services."

120. The Separation Pay Plan of S&P Global Inc., formerly known as the Separation Pay Plan

of McGraw Hill Financial, Inc., meets the definition of an "employee welfare benefit plan" under ERISA.

121. Defendant S&P recognize the Plan to qualify as a plan under ERISA.

122. Under the terms of the Plan, covered employees are entitled to two weeks of severance pay for each year of continuous service, with a minimum payment equal to twelve weeks of pay.

123. The Plan mandates a six-week minimum notice period in the event of involuntary termination of an employee with more than ten years on continuous service. Employees are entitled to one week of pay for each week that they were entitled to notice but were not given such notice.

124. Covered employees may receive these benefits if they are deemed to be "involuntarily terminated" as defined by the Plan.

125. The Plan defines "Involuntary Termination" as a termination resulting from (i) a reduction in force, (ii) a job relocation or elimination, (iii) a job outsourcing, (iv) the conversion of your temporary layoff to a permanent layoff or (v) such other circumstance specified in writing on a case-by-case basis by the Plan Administrator.

126. Defendant S&P owes Plaintiff Ferd benefits under the terms of the Plan.

127. Defendant S&P failed to compensate Plaintiff Ferd for involuntary termination under the terms of the Plan.

128. As described more fully above, Defendant S&P engaged in a scheme to pre-textually allege poor performance of employees, including Plaintiff Ferd, to terminate the employee for cause and avoid having to compensate the employee under the Plan the required compensation for employees who are "involuntarily terminated."

129. As described above, Defendants S&P Global and S&P Standard alleged false poor performance to avoid compensating Plaintiff Ferd for "involuntary termination" under the Plan in violation of ERISA.

## JURY DEMAND

130. Plaintiffs each request a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiffs respectfully requests a judgment against the Defendants:

A. Declaring that Plaintiffs are legal "employees," for all purposes, including, but not limited to, ERISA;

B. Declaring that the Separation Pay Plan of S&P Global Inc., formerly known as the Separation Pay Plan of McGraw Hill Financial, Inc. is an employee welfare benefit plan subject to ERISA;

C. Payment to Plaintiff of all amounts due the Separation Pay Plan of S&P Global Inc., formerly known as the Separation Pay Plan of McGraw Hill Financial, Inc.;

D. An award of attorney's fees, plus the costs and expenses of this action; Pre and post-judgment interest, as afforded by law;

E. All such other legal and equitable relief to which Plaintiffs are entitled.

Dated: New York, New York
February 15, 2019

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By: _____
Parisis G. Filippatos (PF1593)
*Attorneys for Plaintiffs*
45 Broadway, Suite 620
New York, New York 10006
(212) 248-7431
PFilippatos@tpglaws.com