UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM CALLAS, THOMAS CASSESE,
and NATALIE FERD,

                              Plaintiffs,

              -against-

S&P GLOBAL INC.,

                              Defendant.

**MEMORANDUM OPINION**

19 Civ. 1478 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiffs William Callas, Thomas Cassese, and Natalie Ferd – former employees of Defendant S&P Global, Inc. ("S&P")[1] – bring this action against S&P pursuant to the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., challenging Defendant's denial of their claims for severance benefits.  Defendant contends that Plaintiffs are not entitled to severance benefits because their terminations were voluntary.

Defendant S&P moved for summary judgment (Dkt. No. 60), and in a March 31, 2021 order, this Court granted S&P's motion.  (See Dkt. No. 80)  The purpose of this memorandum opinion is to explain the Court's reasoning.

---

[1] Until 2016, S&P was known as McGraw Hill Financial, Inc. ("McGraw Hill").  (Def. R. 56.1 Stmt. ¶ 3)

**BACKGROUND**[2]

## I.    **DEFENDANT'S SEPARATION PAY PLAN**

During their employment with Defendant, Plaintiffs were each covered by
Defendant's Separation Pay Plan (the "Plan").[3]  The Plan is subject to ERISA.  (Cmplt. (Dkt.
No. 1) ¶ 14)  The purpose of the Plan is to provide severance benefits to eligible employees.
(Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 2, 5)  Under the terms of the Plan, an employee is eligible
for severance benefits if he or she (1) is a "'[c]overed employee'" at the time of termination; (2)
was terminated as a result of "'Involuntary Termination,'" as defined in the Plan; and (3)
continues to perform job duties until the employee's termination date (unless not required to do
so).  (Id. ¶ 6 (quoting Administrative Record ("AR") 1 (Dkt. No. 27) at 15))

The Plan defines "Involuntary Termination" as

> a termination of [an employee's] employment that is initiated by one of the
> Participating Companies as a result of (i) a reduction in force, (ii) a job relocation
> or elimination, (iii) a job outsourcing, (iv) the conversion of [an employee's]
> temporary layoff to a permanent layoff or (v) such other circumstances specified
> in writing on a case-by-case basis by the Plan Administrator.  Notwithstanding the
> foregoing, you are not eligible for Separation Pay and benefits under this Plan
> under any of the following situations because the following are not considered to
> be Involuntary Terminations: . . . you are terminated due to your unsatisfactory or
> poor performance . . . .

(AR 1 (Dkt No. 27) at 11-12; see Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 7)

---

[2]  To the extent that the Court relies on facts drawn from Defendant's R. 56.1 statement, it has
done so because Plaintiffs have not disputed those facts or have not done so with citations to
admissible evidence.  Where Plaintiffs disagree with Defendant's characterization of the cited
evidence, and have presented an evidentiary basis for doing so, the Court relies on Plaintiffs'
characterization of the evidence.  See Cifra v. Gen. Elec. Co., 242 F.3d 205, 216 (2d Cir. 2001)
(court must draw all rational factual inferences in non-movant's favor in deciding summary
judgment motion).  Unless otherwise stated, the facts cited by the Court are undisputed.

[3]  McGraw Hill issued an amended and restated Separation Pay Plan effective January 1, 2016,
which became the S&P Global, Inc. Separation Pay Plan, effective January 1, 2017.  (Def. R.
56.1 Stmt. (Dkt. No. 62) ¶¶ 1-4)  Because both plans are "virtually identical," the Court refers to
them together as "the Plan."  (Id. ¶ 7 n.3)

In the event that a Plan participant believes that he or she has not been provided severance pay owed under the Plan, that individual may file a claim with the "Claims Reviewer." Under the Plan, the "Claims Reviewer" is "'the Plan Administrator or the individual designated by him or her pursuant to the terms of this Plan.'"  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 9 (quoting AR 1 (Dkt. No. 27) at 9))  If a claim for severance pay is denied in whole or in part, the Plan participant may appeal that decision to the "Appeal Reviewer."  (Id. ¶ 10)  The Plan names S&P's Vice President, Global Benefits, Payroll & Executive Compensation, as Plan Administrator, and S&P's Executive Vice President, Human Resources, as Appeal Reviewer.[4] (Id. ¶ 13)

## II.    PLAINTIFFS' CLAIMS FOR SEVERANCE BENEFITS

### A.    William Callas

#### 1.    Callas' Employment

Plaintiff William Callas was hired by McGraw Hill as Vice President, Infrastructure Engineering, in November 2013.  (Id. ¶ 14)  He held this position until his termination on April 21, 2016.  (Id. ¶ 27)  In this position, Callas was responsible for "delivering infrastructure and application support in a reliable, consistent, cost efficient and timely manner for the entire Market Intelligence Inc. division of McGraw Hill."  (Id. ¶ 15)

In 2015, S&P acquired SNL Financial.  (Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 156) After this acquisition, numerous S&P employees were replaced by SNL Financial employees. (Id. ¶ 157)  Callas began reporting to Marcus Daley, Chief Technology Officer, in or about

---

[4] Under McGraw Hill's Separation Pay Plan, effective from January 1, 2016 to January 1, 2017, the Plan Administrator was McGraw Hill's Vice President, Global Benefits, and the Appeal Reviewer was McGraw Hill's Executive Vice President, Human Resources.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 12)

November 2015.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 16)  In a January 2016 email to S&P's Chief Operating Officer and the Senior Director of Human Resources, Daley expressed concern that Callas' team was "'disorganized and not on top of key projects.'"  (Id. ¶ 17 (quoting AR 1 (Dkt. No. 28) at 9))  Daley continued to express concern about Callas' performance throughout the first quarter of 2016, including that the "'negativity'" on Callas' team was "'pointedly worse'" than on other teams.  (Id. ¶ 19 (quoting AR 1 (Dkt. No. 28) at 13))

On April 20, 2016, Daley requested approval to terminate Callas' employment, citing Callas' poor work performance, "including inconsistent communication and ownership of key strategic decisions and inability to deliver critical capabilities that would allow the company to safely run its business."  (Id. ¶¶ 24-25)  Daley's request was approved, and Callas' employment was terminated on April 21, 2016.  (Id. ¶¶ 26-27)

Prior to his termination, Callas was not informed that his job was in jeopardy.  (Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 159)  Callas had likewise never been the subject of written discipline.[5]  (Id. ¶ 158)

After Callas' termination, he was replaced by an S&P employee based in Charlottesville, Virginia, who was later replaced by an S&P employee in New York.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 28-29)

### 2.    Callas' Claim for Severance Pay

Callas submitted a claim for unpaid severance pay to the Plan Administrator on April 20, 2017.  (Id. ¶ 30)  He claimed that his termination was an Involuntary Termination –

---

[5]  Defendant notes that in February, March and April 2016 emails to Callas, Daley expresses concerns regarding the negativity on Callas' team, certain projects on which Callas is working, and Callas' communications with Daley and others.  (Def. R. 56.1 Reply (Dkt. No. 69) ¶ 158 (citing AR 1 (Dkt. No. 30) at 10-12, 14; id. (Dkt. No. 31) at 1-2, 12-13))

thus entitling him to severance benefits under the Plan – because his termination was part of S&P's effort to shift business operations to locations other than New York.  (Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 33)  Callas also asserted that he "was an excellent employee of S&P who received no criticisms of his work or his performance until a subpar performance review in 2016," which "coincided with multiple layoffs of S&P employees located in New York and a shift in S&P operations to offices in Virginia and Colorado."  (AR 1 (Dkt. No. 27) at 36)  Callas further stated that he "was never put on a performance improvement plan, was never given a 'last and final' warning by S&P, nor was he ever given any guidance or told of any work-related issues by any supervisors."  (Id.)  Callas did not submit any documentation in support of his claim.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 34)

On June 8, 2017, the Plan Administrator issued a decision denying Callas' claim for severance benefits.  (Id. ¶ 35)  In the decision, the Plan Administrator states that he "had been advised by S&P" that Callas "was terminated for poor performance of his job responsibilities," and that the Plan Administrator had "been provided with an internal memorandum evidencing that the rationale for [Callas'] termination was continuous poor performance and a lack of productivity in his role."  (AR 1 (Dkt. No. 27) at 38)  Based on the "internal memorandum" – presumably Daley's memorandum seeking permission to terminate Callas' employment – Callas' claim letter, and the relevant Plan provisions, the Plan Administrator concluded that Callas was not subject to an Involuntary Termination as defined by the Plan, because (1) "he was not terminated due to a reduction in force, job relocation, job outsourcing, conversion of a temporary layoff to a permanent layoff or other circumstances specified in writing on a case-by-case basis by the Plan Administrator," and (2) "he was [instead] terminated due to poor performance, which

is explicitly excluded from the definition of Involuntary Termination." (Id. at 39; Pltf. R. 56.1

Stmt. (Dkt. No. 74) ¶ 162)

       In rejecting Callas' claim, the Plan Administrator notes that Callas' assertion that

his

> termination coincided with layoffs in other locations and that Mr. Callas was
> never put on a performance improvement plan, was never given a final warning,
> received a long-term incentive shortly before his termination, and was not given
> guidance nor told of work-related issues do not alter this conclusion.  Even if all
> of these assertions were true, it remains the case that the Company's rationale for
> Mr. Callas's termination was poor performance and not one of the required
> reasons for it to constitute an Involuntary Termination.

(AR 1 (Dkt. No. 29) at 10)

### 3.    Callas' Appeal

       On August 14, 2017, Callas appealed the Plan Administrator's denial of his claim

for severance pay.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 39)  In his appeal, Callas again argues that

he was terminated as part of a restructuring at S&P, and not because of poor work performance,

and that therefore his termination qualifies as an Involuntary Termination as defined in the Plan.

(Id. ¶¶ 41-42; Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 171)  Callas also asserts that he had received

positive performance reviews prior to 2016; that he was told in 2014 that he was "considered a

top talent in the company by various supervisors"; and that, at the end of 2015, he had received a

performance appraisal of "achieved/average."  (AR 1 (Dkt. No. 27) at 43; Pltf. R. 56.1 Stmt.

(Dkt. No. 74) ¶ 40)

       In connection with his appeal, Callas asked the Plan Administrator to provide

records relating to his termination, including all performance reviews and information relating to

staffing changes in S&P's New York, Virginia, and Colorado offices.  (Def. R. 56.1 Stmt. (Dkt.

No. 62) ¶ 43; Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶¶ 165, 167, 169)  Callas was given a copy of

Daley's memorandum.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 43; AR 1 (Dkt. No. 27) at 55-56)

Defendant did not provide the performance reviews and staffing information that Callas had

requested.  (Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶¶ 166, 168, 170)

On November 29, 2017, Defendant submitted its response to Callas' appeal.

(Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 45)  Defendant's submission includes exhibits concerning his

alleged poor work performance.  (Id. ¶¶ 45-47)  Callas submitted a written reply to Defendant's

submission; his reply does not include additional documents.  (Id. ¶¶ 49-50)

On February 16, 2018, the Appeal Reviewer issued a seven-page decision

denying Callas' appeal.  (Id. ¶ 51; AR 1 (Dkt. No. 28) at 45-51)  The Appeal Reviewer states that

her decision is premised on the following documents:  (1) Callas' initial claim for benefits; (2)

the Plan Administrator's denial of Callas' initial claim; (3) Callas' appeal letter and exhibits; (4)

S&P's response to Callas' appeal, (5) Callas' supplemental response to S&P's submission; (6)

emails from Daley, Callas' supervisor, discussing his work performance between January 2016

and April 2016; (7) Daley's memorandum seeking permission to terminate Callas' employment;

and (8) the relevant Plan documents.  (AR 1 (Dkt. No. 28) at 47; Def. R. 56.1 Stmt. (Dkt. No. 62)

¶ 52)

Based on these materials, the Appeal Reviewer concludes that Callas' termination

was not an Involuntary Termination within the meaning of the Plan, because (1) Callas was "not

terminated due to a reduction in force, job relocation, job outsourcing, conversion of a temporary

layoff into a permanent layoff or other circumstances specified in writing on a case-by-case basis

by the Plan Administrator"; and (2) Callas was terminated "due to unsatisfactory or poor

performance, which is explicitly excluded from the definition of Involuntary Termination."  (AR

1 (Dkt. No. 28) at 51; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 53-55)

As to Callas' argument that he had been terminated "as part of a relocation of positions outside of New York," the Appeal Reviewer notes that "Mr. Callas' initial replacement (Mr. Cairns) was himself replaced by Mr. Franklin, who is located in New York." (AR 1 (Dkt. No. 28) at 50) The Appeal Reviewer also notes that "other contemporaneous documentary evidence . . . of Mr. Daley's displeasure with Mr. Callas' performance clearly rebut[s]" "any inference that Mr. Callas' termination was due to a desire to relocate the position, rather than performance." (Id. at 51)

### B. Thomas Cassese

#### 1. Cassese's Employment and Termination

Plaintiff Thomas Cassese was hired as an Associate Director-Producer with S&P Global Market Intelligence Inc. in 2008. (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 57) His position "was changed to Senior Operations Associate in 2014, and by the end of his employment in November 2016, he had a functional or business title of Global Head of Ratings Xpress Operations, within Credit Solutions." (Id. ¶ 59)

In his 2015 year-end performance review, Cassese was given a "'full achievement'" rating. (Id. ¶ 61) (quoting AR 2 (Dkt. No. 34-4) at 11)) His review identified several areas that needed improvement, however, including that Cassese "needed [to] 'improve his local NY-based staff, [and] to sustain and improve the performance of our global organization,'" to "'expand his leadership to ensure that we have a succession and training plan in place,'" and "to 'continue to work on his technical and analytical skills to raise the bar in pre and post sales support.'" (Id. ¶¶ 61-63 (quoting AR 2 (Dkt. Nos. 34-4) at 11)) Cassese's supervisor, Jeffrey Simon, met with Cassese to discuss several of these areas in which improvement was necessary. (Id. ¶¶ 64-65)

In Cassese's 2016 mid-year performance review, his supervisor identified additional issues, including that (1) he had missed twenty-seven days of work in the first quarter; (2) on several occasions he had falsely stated that he had completed certain of his tasks and projects; and (3) Cassese was not fulfilling his leadership and management responsibilities.[6]  (Id. ¶¶ 67-71)  In this review, Cassese was warned he "'need[ed] to immediately remedy his attendance and performance shortcomings,' complete his job responsibilities, and be engaged and accountable for all product operational needs."  (Id. ¶ 73 (quoting AR 2 (Dkt. Nos. 34-4) at 12) (alteration in original))

On September 21, 2016, Cassese "received a Written Performance Warning" from his supervisor.  (Id. ¶ 74)  This warning states that Cassese and his supervisor had had "numerous conversations about [Cassese's job] performance," but that there had "not been any sustained improvement."  (AR 2 (Dkt. No. 35-1) at 11)  The warning highlights three areas in which Cassese needed to improve:  "perform[ing] operational duties," "provid[ing] leadership to credit solutions senior management and product owners," and "time and attendance."  (Id. at 11-12; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 75)  The warning also states that a "failure to meet any or all of the requirements described . . . will result in further disciplinary action, up to and including immediate termination of employment without further warning or notice.  Termination for failure to meet any of the requirements of this Performance Warning will be for cause and no separation benefits will be payable."  (AR 2 (Dkt. No. 35-1) at 12; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 76-77)

---

[6]  The twenty-seven days of absence did not include leave that Cassese took pursuant to the Family and Medical Leave Act.  (Id. ¶ 67)

On November 21, 2016, Cassese's supervisor requested permission to terminate his employment, noting continued problems with Cassese's performance in the areas discussed in Cassese's September 21, 2016 Written Performance Warning.  (AR 2 (Dkt. No. 35-2) at 1; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 78)  The request was approved, and Cassese's employment was terminated on December 7, 2016.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 79-80)

### 2.      Cassese's Claim for Severance Pay

On May 26, 2017, Cassese submitted a claim for severance pay, asserting that he was entitled to severance pay because his termination was an Involuntary Termination within the meaning of the Plan.  (Id. ¶¶ 82, 85)  Cassese stated that he had been an "excellent employee," that he had excellent performance reviews prior to 2016, that his work had never been criticized, and that he had never been warned that his job was in jeopardy.  (Id. ¶ 83)  Cassese argued that his termination was part of a company restructuring, and that he and other S&P employees had been "given pretextual poor performance reviews in an attempt by S&P to terminate employees without needing to adhere to the terms of The Plan."  (AR 2 (Dkt. No. 34-2) at 9; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 84)  Cassese did not submit any supporting documentation in connection with his claim for benefits.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 86)

On August 24, 2017, the Plan Administrator denied Cassese's claim for severance pay.  (Id. ¶ 87)  The Plan Administrator reported that S&P had "advised . . . that Mr. Cassese was terminated for poor performance of his job responsibilities," and that the company had submitted "an internal memorandum evidencing that the rationale for [Cassese's] termination was poor performance in his role."  (AR 2 (Dkt. No. 34-2) at 12)  Having reviewed Cassese's claim letter, the relevant Plan provisions, and the internal memorandum summarizing the rationale for Cassese's termination, the Plan Administrator concluded that Cassese's termination was not an

Involuntary Termination within the meaning of the Plan, because Cassese was "not terminated due to a reduction in force, job relocation, job outsourcing, [or] conversion of a temporary layoff to a permanent layoff or other circumstances specified in writing on a case-by-case basis by the Plan Administrator."  (Id.; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 88-89; Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 174)  The Plan Administrator concluded that Cassese's termination was instead "due to poor performance, which is explicitly excluded from the definition of Involuntary Termination." (AR 2 (Dkt. No. 34-2) at 12)

   In reaching this decision, the Plan Administrator acknowledged Cassese's assertions that his "termination coincided with layoffs in other locations, that prior to 2016 Mr. Cassese's performance reviews were 'all excellent', and that prior to 2016 Mr. Cassese did not receive criticisms of his work nor was he told that he needed to improve aspects of his work." (Id. at 13)  Cassese's assertions regarding the circumstances of his termination "d[id] not alter [the Plan Administrator's] conclusion," however, because "[e]ven if all of [Cassese's] assertions were true, it remains the case that the Company's rationale for Mr. Cassese's termination was poor performance and not one of the required reasons for it to constitute an Involuntary Termination."  (Id.; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 90)

### 3. Cassese's Appeal

   On October 26, 2017, Cassese appealed the denial of his claim for severance pay. (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 91)  In his appeal, Cassese acknowledged that he had been informed during his 2016 Mid-Year Review, and again in connection with a September 21, 2016 Performance Warning, that his job performance was unsatisfactory.  (Id. ¶ 93)  Cassese argued, however, that the complaints about his job performance were "vague" and that there was "no documentary evidence that [he] was performing his duties in an unsatisfactory manner."  (Id. ¶¶

93-94 (quoting AR 2 (Dkt. No. 34-3) at 4))  Cassese further argued that he, "along with many other co-workers in his department in the New York office, were suddenly giv[en] nonsensical poor performance reviews," that S&P "sought to create a false trail of performance issues in an attempt to avoid having to pay Mr. Cassese his owed severance pay," and that, on "information and belief, Mr. Cassese's replacement earns significantly less money than Mr. Cassese."  (AR 2 (Dkt. No. 34-3) at 4-5; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 95)

On June 13, 2018, the Appeal Reviewer asked S&P to provide additional information concerning the circumstances of Cassese's termination.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 96)  In responding to Cassese's appeal, S&P submitted Cassese's 2015 and 2016 performance reviews, his September 2016 Performance Warning, and the November 2016 request from Cassese's supervisor seeking permission to terminate Cassese's employment.  (Id. ¶¶ 97-99)

In responding to S&P's submission, Cassese pointed to positive statements in his 2015 performance review, and again argued that his termination was the result of a company-wide restructuring.  (Id. ¶¶ 102-04)

On June 13, 2018, the Appeal Reviewer issued an eight-page decision denying Cassese's appeal.  (Id. ¶ 105; AR 2 (Dkt. Nos. 35-2) at 6-13; id. (Dkt. No. 35-3) at 1)  The Appeal Reviewer cites the following materials in making her decision:  (1) Cassese's initial claim for benefits; (2) the Plan Administrator's denial of Cassese's initial claim; (3) Cassese's appeal letter; (4) his supplemental appeal letter; (5) his 2015 performance review; (6) his 2015 mid-year review; (7) his 2015 year-end review; (8) his 2016 performance review; (9) his 2016 mid-year review; (10) his September 2016 Performance Warning; (11) the November 2016 request by Cassese's supervisor to terminate Cassese's employment; and (12) the relevant Plan documents.  (AR 2 (Dkt. No. 35-2) at 6)

The Appeal Reviewer concludes that Cassese's termination does not qualify as an Involuntary Termination within the meaning of the Plan, because the record demonstrates that (1) S&P "terminated Mr. Cassese because it reasonably perceived his performance to be unsatisfactory," and (2) Cassese was "not terminated as a result of a reduction in force, job relocation, job outsourcing, conversion of a temporary layoff into a permanent layoff or other circumstances specified in writing on a case-by-case basis by the Plan Administrator." (Id. at 8, 12)

The Appeal Reviewer acknowledges Cassese's claim that he had been "terminated as part of organizational shifts at [S&P,]" but finds that Cassese's argument is "not supported by the underlying documentation." (Id. at 13)

### C.   Natalie Ferd

#### 1.   Ferd's Employment and Termination

Natalie Ferd was employed at S&P from 2002 to 2017, and she held the position of Lead Software Developer during her last two years of employment. (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 110-11; Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 110) In 2015 and 2016, Ferd's supervisor informed her that her work performance required improvement in certain areas. (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 112-15) For example, in Ferd's 2015 mid-year review, the supervisor states that he is "'[l]ooking [to Ferd for] a better performance [in] the remainder of the year, ensuring that all deadlines and deliverables [are met],'" and that Ferd "'meet[s] expectations with very minimal supervision and in a timely manner.'" (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 112 (quoting AR 3 (Dkt. No. 38-2) at 10)) In Ferd's 2015 year-end review, the supervisor states that while Ferd "'completed all assigned tasks on time,'" "'on some occasions [she] required some additional follow up and supervision to ensure timelines were met.'" (Id. ¶ 113 (quoting AR 3

(Dkt Nos. 38-2) at 10))  Ferd's 2016 mid-year review identifies several areas for improvement, including timely completion of tasks.  (Id. ¶¶ 114-15)

On August 23, 2016, Ferd was placed on a 60-day Performance Improvement Plan ("PIP").  (Id. ¶ 116)  The PIP identifies three areas of improvement:  (1) "[f]ocus and accountability on assigned task/Time Management"; (2) "[u]nderstanding of the current system that will be supporting and developing: GDS API"; and (3) "[a] better command on Java language."  (AR 3 (Dkt. No. 38-1) at 5; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 117)

On November 16, 2016, Ferd received a Final Written Performance Warning. The Final Warning states that there had not been "'sustained improvement'" in Ferd's job performance, and identifies several work areas that "'must immediately be brought up to acceptable levels.'"  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 119 (quoting AR 3 (Dkt. No. 38-3) at 2) The Final Warning further states that a "'[f]ailure to meet any or all of the requirements of this Performance Warning . . . will result in further disciplinary action, up to and including immediate termination of employment without further warning or notice.'"  (Id. ¶ 120 (quoting AR 3 (Dkt. No. 38-3) at 3))  Ferd also received a "'Requires Improvement'" rating in her 2016 year-end review.  (Id. ¶ 121 (quoting AR 3 (Dkt. No. 38-1) at 3))

In January 2017, Ferd's supervisor sought approval to terminate her employment, due to her "continued poor performance and failure to satisfy the requirements set forth in the Final Warning."  (Id. ¶ 122)  The request to terminate Ferd's employment was approved, and Ferd was terminated on January 18, 2017.  (Id. ¶¶ 123-24)

### 2.     Ferd's Claim for Severance Pay

In Ferd's May 26, 2017 claim for severance pay, she asserts that her termination was an Involuntary Termination within the meaning of the Plan.  (Id. ¶¶ 125, 128)  Ferd states

that she was an excellent employee during the fifteen years she worked for S&P, and that prior to 2016, her work had never been criticized.  (Id. ¶ 126)  Like Callas and Cassese, Ferd argues that her termination was part of a company-wide restructuring, and that she and other co-workers were "suddenly given pretextual poor performance reviews in an attempt by S&P to terminate employees without needing to adhere to the terms of The Plan."  (AR 3 (Dkt. No. 37-3) at 7; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 127)  Ferd did not submit any supporting documentation in connection with her claim for severance pay.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 129)

The Plan Administrator denied Ferd's claim for severance pay on August 24, 2017.  (Id. ¶ 130)  In reaching this decision, the Plan Administrator cites Ferd's claim letter, relevant provisions in the Plan, and an internal S&P memorandum summarizing the rationale for Ferd's termination.  (AR 3 (Dkt. No. 37-3) at 9-10)  The Plan Administrator notes that he had been "advised by S&P . . . that Ms. Ferd was terminated for poor performance of her job responsibilities."  (Id. at 9; Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 176)  The Plan Administrator concludes that Ferd's termination is not an Involuntary Termination within the meaning of the Plan because (1) she was not terminated pursuant to "a reduction in force, job relocation, job outsourcing, conversion of a temporary layoff to a permanent layoff, or other circumstances specified in writing on a case-by-case basis by the Plan Administrator," and (2) she was instead terminated for "poor performance, which is explicitly excluded from the definition of Involuntary Termination" under the Plan.  (AR 3 (Dkt. No. 37-3) at 9; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 132)

In rejecting Ferd's claim, the Plan Administrator acknowledges Ferd's argument that – prior to 2016 – she had received adequate performance evaluations, and her work had not been criticized.  These circumstances did "not alter [the Plan Administrator's] conclusion,"

however, because "[e]ven if all of these assertions were true, it remains the case that [S&P's] rationale for Ms. Ferd's termination was poor performance and not one of the required reasons for it to constitute an Involuntary Termination."  (AR 3 (Dkt. No. 37-3) at 10)

### 3. **Ferd's Appeal**

On October 26, 2017, Ferd appealed the denial of her claim for severance pay. (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 135)  In her appeal, Ferd repeats her argument that – prior to 2016 – her work had not been criticized, and she contends that the criticism she began to receive in 2016 reflects S&P's effort "to avoid [its] responsibilities under the Plan by creating a false trail of poor performance [reviews.]"  (AR 3 (Dkt. No. 37-4) at 5-6; Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 139)

In response to Ferd's appeal, the Appeal Reviewer requested additional information from S&P regarding the circumstances of Ferd's termination.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 140)  In its February 6, 2018 response, S&P submitted Ferd's 2015 and 2016 performance reviews; her 2016 mid-year evaluation; her August 2016 Performance Improvement Plan; the November 2016 Final Warning; her 2016 year-end review; emails Ferd had sent in response to the Final Warning and the 2016 year-end review challenging her supervisor's assertion that her work had not improved; and her supervisor's January 2017 request for permission to terminate her employment.  (Id. ¶¶ 141-43; AR 3 (Dkt. No. 38-3) at 6)

On June 13, 2018, the Appeal Reviewer denied Ferd's appeal in a 12-page decision.  (Id. ¶¶ 149-50)  The Appeal Reviewer cites the following materials in her decision: (1) Ferd's initial claim for severance pay; (2) the Plan Administrator's letter denying Ferd's claim; (3) Ferd's appeal of the Plan Administrator's denial; (4) S&P's response to Ferd's appeal; (5) Ferd's response to S&P's submission; (6) Ferd's 2015 performance review; (7) her 2016 mid-

year evaluation; (8) her August 2016 Performance Improvement Plan; (9) the November 2016

Final Warning; (10) her 2016 performance review; (11) her 2016 year-end review; (12) Ferd's

email responses to the Final Warning and the 2016 year-end review; and (13) Ferd's supervisor's

request for permission to terminate Ferd's employment.  (AR 3 (Dkt. Nos. 38-4) at 5-10; id.

(Dkt. No. 39) at 1-4)

The Appeal Reviewer concludes that Ferd's termination is not an Involuntary

Termination within the meaning of the Plan because (1) S&P "stated that Ms. Ferd's termination

was due to her unsatisfactory or poor performance," and (2) she "was not terminated as part of a

reduction in force, job relocation, job outsourcing, conversion of a temporary layoff to a

permanent layoff, or other circumstances specified in writing on a case-by-case basis by the Plan

Administrator."  (AR 3 (Dkt. Nos. 38-4) at 6)  The Appeal Reviewer acknowledges Ferd's

argument that the reasons given for her termination are pretextual, but states that,

> other than unsupported circumstantial claims, [there is no] basis for concluding
> that there was any pretextual reason [for Ferd's termination].  In contrast, not only
> has [S&P] stated that its reason for the termination was for poor or unsatisfactory
> performance, but . . . the record, which includes contemporaneous documentation,
> provides a reasonable basis for [S&P] to have reached that conclusion.

(Id. at 3)

## DISCUSSION

S&P argues that it is entitled to summary judgment because Plaintiffs have not

shown that "the determination by the Plan Administrator and Appeal Reviewer that each

Plaintiff's termination did not fall within the meaning of Involuntary Termination as defined by

the Plan was arbitrary and capricious or wholly unsupported by evidence in the administrative

record."  (Def. Br. (Dkt. No. 66) at 24)

## I.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." <u>Beyer v. Cty. of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008) (quoting <u>Guilbert v. Gardner</u>, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing <u>Dister v. Cont'l Grp., Inc.</u>, 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" <u>Yi Fu Chen v. Spring Tailor, LLC</u>, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting <u>Krynski v. Chase</u>, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (quoting <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001) (quoting <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact

where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)

(alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.    STANDARD OF REVIEW

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a de

novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority

to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire and

Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Where the plan grants such discretionary

authority, courts "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary

and capricious.'"  Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009) (quoting

Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995)).  "The plan administrator bears

the burden of proving that the deferential standard of review applies."  Fay v. Oxford Health

Plan, 287 F.3d 96, 104 (2d Cir. 2002) (citing Kinstler v. First Reliance Standard Life Ins. Co.,

181 F.3d 243, 249 (2d Cir. 1999)).

Here, the Plan grants the Plan Administrator and Appeal Reviewer discretionary

authority to interpret the terms of and administer the Plan:

> The Plan is administered and operated by the Plan Administrator (along with the
> Appeal Reviewer, to the extent of its responsibilities) who has full and complete
> authority to construe and interpret the provisions of the Plan, to determine an
> individual's entitlement to benefits under the Plan, to make in its sole and
> absolute discretion all determinations contemplated under the Plan, to investigate
> and make factual or other determinations necessary or advisable to administer or
> implement the Plan, to decide and resolve any and all questions and
> interpretations arising in connection with the Plan and to adopt and implement
> such rules and procedures as the Plan Administrator (or Appeal Reviewer, as
> applicable) shall deem necessary or advisable for the administration or
> implementation of the Plan.  All determinations under the Plan by the Plan
> Administrator (or where applicable [the] Appeals Reviewer) is final and binding
> on all interested persons.

(Def. R. 56.1 Stmt. (Dkt. No. 62) ¶ 11 (quoting AR 1 (Dkt. No. 27) at 21-22))

Given this Plan language, the "arbitrary and capricious" standard governs this Court's review of the Plan Administrator's and Appeal Reviewer's determinations.

"Under the arbitrary and capricious standard of review, [a court] may overturn an administrator's decision to deny ERISA benefits 'only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Hobson, 574 F.3d at 83 (quoting Pagan, 52 F.3d at 442). "Substantial evidence 'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] . . . requires more than a scintilla of evidence but less than a preponderance.'" Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995) (alteration in original) (quoting Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)).

"This scope of review is narrow," Hobson, 574 F.3d at 83, and "'[a]bsent a showing of bad faith or arbitrariness, the court will not disturb [a plan administrator's] interpretations of [the] plan as long as they are consistent with the plan's terms and purpose.'" Sansevera v. DuPont de Nemours & Co., 859 F. Supp. 106, 112 (S.D.N.Y. 1994) (quoting Seff v. NOITU Ins. Trust Fund, 781 F. Supp. 1037, 1040 (S.D.N.Y. 1992)). Indeed, where a claimant and the plan administrator both "'offer rational, though conflicting, interpretations of plan provisions, the [plan administrator's] interpretation must be allowed to control.'" Pulvers v. First Unum Life Ins., Co., 210 F.3d 89, 92-93 (2d Cir. 2000) (quoting O'Shea v. First Manhattan Co. Thrift Plan & Trust, 55 F.3d 109, 112 (2d Cir. 1995)). Similarly, a court is "'not free to substitute [its] own judgment for that of [the plan administrator] as if [it] were considering the issue of eligibility anew.'" Hobson, 574 F.3d at 83-84 (2d Cir. 2009) (quoting Pagan, 52 F.3d at 442).

Finally, "a district court's review under the arbitrary and capricious standard is limited to the administrative record." Miller, 72 F.3d at 1071; Bergquist v. Aetna U.S. Healthcare, 289 F. Supp. 2d 400, 411 (S.D.N.Y. 2003) ("The Court must limit its examination of evidence to the administrative record when reviewing administrative decisions under the arbitrary and capricious standard.").

The standard of review remains the same even where, as here, a plan administrator has a conflict of interest. See Metro. Life Ins. v. Glenn, 554 U.S. 105 (2008). The Plan Administrator and the Appeal Reviewer have a conflict of interest, because they are both employed by S&P, and S&P pays benefits to claimants under the Plan from company assets. (Def. Reply (Dkt. No. 70) at 5). "[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make de novo review appropriate. This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation." McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008) (citing Glenn, 554 U.S. at 111-12).

## III.   WHETHER PLAINTIFFS HAVE DEMONSTRATED THAT THE PLAN ADMINISTRATOR'S DETERMINATIONS ARE ARBITRARY AND CAPRICIOUS

As claimants, Plaintiffs bear the burden of demonstrating that they qualify for severance pay under the Plan by showing that their terminations were Involuntary Terminations – i.e., (1) that they were not terminated due to poor performance, and (2) that they were terminated as part of a reduction in force, job relocation or elimination, job outsourcing, conversion of a temporary layoff to a permanent layoff, or "such [] other circumstances specified in writing on a case-by-case basis by the Plan Administrator." (AR 1 (Dkt. No. 27) at 11;

Gannon v. Aetna Life Ins. Co., No. 05 Civ. 2160 (JGK), 2007 WL 2844869, at *11 (S.D.N.Y.

Sept. 28, 2007) (citing Juliano v. Health Maintenance Org. of N.J., 221 F.3d 279, 287-88 (2d Cir.

2000)).

    Here, the Plan Administrator and Appeal Reviewer determined – as to each

Plaintiff – that their termination did not qualify as an Involuntary Termination because (1) the

termination was not the result of a reduction in force, job relocation or elimination, job

outsourcing, conversion of a temporary layoff to a permanent layoff, or other circumstances

specified by the Plan Administrator; and (2) each Plaintiff was terminated due to poor

performance.  (See Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 37, 53-55, 88-89, 106, 132; Pltf. R. 56.1

Stmt. (Dkt. No. 74) ¶¶ 162, 174; AR 1 (Dkt. No. 27) at 39; id. (Dkt. No. 28) at 45-51; AR 2 (Dkt.

No. 34-2) at 12; id. (Dkt. No. 35-2) at 8-12; AR 3 (Dkt. Nos. 37-3) at 9; id. (Dkt. No. 38-4) at 6)

    In making these determinations, the Plan Administrator relied on memoranda

drafted by Plaintiffs' supervisors explaining the rationale for each Plaintiff's termination, as well

as Plaintiffs' applications for severance pay and the relevant Plan documents.  (Def. R. 56.1

Stmt. (Dkt. No. 62) ¶¶ 36, 87; Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶ 176; AR 1 (Dkt. No. 27) at 38;

AR 2 (Dkt. No. 34-2) at 12; AR 3 (Dkt. No. 37-3) at 9)

    The Appeal Reviewer considered these same documents, but requested, obtained,

and considered other documents concerning the circumstances of Plaintiffs' terminations.  These

additional documents include performance reviews and internal emails regarding Plaintiffs' work

performance, as well as supplemental submissions from Plaintiffs.  (Def. R. 56.1 Stmt. (Dkt. No.

62) ¶¶ 51, 53, 105, 149; AR 1 (Dkt. No. 28) at 45-57; AR 2 (Dkt. No. 35-2) at 6-13; id. (Dkt. No.

35-3) at 1; AR 3 (Dkt. No. 38-4) at 3-10; id. (Dkt. No. 39) at 1-4)

The Plan Administrator and Appeal Reviewer considered – and rejected – Plaintiffs' arguments that their terminations were part of a company-wide restructuring, and that their poor performance reviews had been fabricated as part of a scheme by S&P to avoid its obligation to pay severance. The Plan Administrator and Appeal Reviewer found that even if Plaintiffs' allegations regarding a company-wide restructuring were true, the record demonstrated – as to each Plaintiff – that the basis for termination was poor work performance. (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 37, 55, 88-90; AR 1 (Dkt. No. 27) at 39; id. (Dkt. No. 28) at 50-51; AR 2 (Dkt. No. 34) at 12-13; id. (Dkt. No. 35-2) at 13; AR 3 (Dkt. No. 37-3) at 10)

Plaintiffs argue, however, that the Plan Administrator and Appeal Reviewer acted arbitrarily and capriciously in denying their claims for severance pay, because they (1) deprived "Plaintiffs [of] their right to a full and fair review of their claims"; and (2) had conflicts of interest. (Pltfs. Opp. (Dkt. No. 73) at 24-28) Plaintiffs contend that this Court should give "weigh[t] [to these] conflict[s] . . . and lessen the degree of deference given to [the administrative] decisions." (Id. at 25)

The Court considers each argument below.

**A.**     **Whether Plaintiffs Received a Full and Fair**
           **Review of their Claims for Severance Pay**

In arguing that they did not receive a full and fair review of their claims for severance pay, Plaintiffs complain that (1) the Plan Administrator "relied on a one to two-page internal memorandum of Defendant as the complete basis for his denials of Plaintiffs' claims," and "failed to analyze any evidence relevant to Plaintiffs' claims that the supposed 'voluntary performance-based terminations were pretext for a scheme to terminate New York employees in a manner that enabled Defendant to avoid paying terminated employees their severance" (id. at 27-28); and (2) the Appeal Reviewer "made no effort to develop the record [concerning

Plaintiffs' claims of pretext] and instead relied on the very evidence that Plaintiffs alleged to be part of Defendant's orchestrated attempt to classify 'involuntary' terminations as 'voluntary'" (id. at 29), thereby "cho[osing] to be 'willfully blind.'"  (Id.) (quoting Ricciardi v. Metropolitan Life Ins. Co., No. 16-CV-3805(CM), 2019 WL 652883, at *8 (S.D.N.Y. Feb. 15, 2019))

Callas further complains that the Appeal Reviewer (1) did not "obtain and consider evidence related to [S&P's] policies and practices regarding discipline and performance" (id. at 30), and that the Appeal Reviewer (2) "made conclusions based upon evidence that was never put into the record and cited her 'understanding and beliefs' related to performance indicators, company disciplinary practice, and restructuring."  (Id.) (quoting AR 1 (Dkt. No. 28) at 49-51)

### 1.     ERISA Requirements

29 U.S.C. § 1133, provides that

[i]n accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

ERISA's regulations address the requirements for a "full and fair review" of any decision denying a claim for benefits:

Full and fair review. Except as provided in paragraphs (h)(3) and (h)(4) of this section, the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures –

(i)   Provide claimants at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination;

(ii)  Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section;

(iv)  Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2); see also Cohen v. Liberty Mut. Grp. Inc., 380 F. Supp. 3d 363, 385 (S.D.N.Y. 2019) ("A 'full and fair review' includes 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decisionmaker consider the evidence presented by both parties prior to reaching and rendering his decision.'") (quoting Cook v. N.Y. Times Co. Long-Term Disability Plan, No. 02 Civ. 9154 (GEL), 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30, 2004)).

## 2.   **Analysis**

As an initial matter, to the extent that Plaintiffs argue that the Plan Administrator failed to conduct a "full and fair review," that argument is misplaced.  As the statutory provision and regulations quoted above make clear, the "full and fair review" requirements apply once an

"adverse benefit determination" has been issued.[7]  See 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(h)(2).

While a plan administrator is obligated to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant," 29 U.S.C. § 1133(1), Plaintiffs do not contend that the Plan Administrator's decisions do not meet these requirements.  And, as discussed above, the Plan Administrator notified each Plaintiff in writing of the denial of his or her claim for severance play, explaining in plain language the reasons for the denial.

The Court addresses below Plaintiffs' claims that the Appeal Reviewer did not properly develop the record concerning Plaintiffs' claims of pretext and S&P's policies and procedures regarding employee discipline and work performance.

<blockquote>
a. <strong>Alleged Failure to Develop the Record<br>Concerning Plaintiffs' Claims of Pretext</strong>
</blockquote>

Plaintiffs complain that the Appeal Reviewer failed to develop the record as to their claims that the poor work performance evaluations "were pretext for Defendant's actual intention of shifting operations to other locations and terminating New York employees in a

---

[7]  In any event, Plaintiffs' argument that the Plan Administrator's decisions were not based on "substantial evidence" fails.  The Plan Administrator based his decisions on Plaintiffs' claim letters, internal S&P memoranda explaining the rationale for Plaintiffs' terminations, and the relevant Plan provisions.  This is "'evidence that a reasonable mind might accept as adequate to support the conclusion reached.'"  Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) (quoting Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)) Moreover, "[g]iven that only a rational connection is necessary between the facts relied upon and the decision to deny benefits," Glavan v. Bldg. Serv. 32B-J Health Fund, No. 96 Civ. 4145 (SHS), 1997 WL 381789, at *3 (S.D.N.Y. July 10, 1997), the Plan Administrator's denial of Plaintiffs' claims on the basis of the evidence before him was not arbitrary and capricious.

manner that enabled Defendant to avoid awarding severance benefits."  (Pltfs. Opp. (Dkt. No. 73) at 28)

As discussed above, ERISA's regulations provide that a claimant is entitled to "documents, records, and other information relevant to the claimant's claim for benefits."  29 C.F.R. § 2560.503-1(h)(2)(iii).  A document, record, or other information is "'relevant'" to a claim for benefits if it

(i)  [w]as relied upon in making the benefit determination;

(ii)  [w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; [or]

(iii) [d]emonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination[.]

29 C.F.R. § 2560.503-1(m)(8); see also 29 C.F.R. § 2560.503-1(b)(5) ("The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.").

Here, Plaintiffs do not address what constitutes a "relevant" document or record under ERISA, much less show that they were deprived of "relevant" documents, records or other information within the meaning of ERISA's regulations.  To the extent that Plaintiffs contend that the Appeal Reviewer should have sua sponte sought documents, records, and information concerning S&P's staffing practices in New York and other locations,[8] Plaintiffs have not shown

---

[8]  It appears that only Callas asked the Appeal Reviewer to obtain documents concerning changes in staffing in S&P's New York, Virginia, and Colorado offices.  (Def. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 43-44; Pltf. R. 56.1 Stmt. (Dkt. No. 74) ¶¶ 167, 169)

that such materials fall within any of the categories of "relevant" documents listed in ERISA's regulations.  Plaintiffs do not argue that such documents and records were relied on or submitted, considered, or generated in connection with Plaintiffs' claims for severance pay, nor would such documents and records "[d]emonstrate[] compliance" with the administrative processes and safeguards set forth in the ERISA regulations.  29 C.F.R. § 2560.503-1(m)(8)(iii).  In sum, Plaintiffs have not demonstrated that they were deprived of "relevant" documents, records and other information in connection with their appeals.

       To the extent that Plaintiffs argue that the Appeal Reviewer's failure to "develop the record" concerning their claims of pretext deprived them of a "full and fair review" (see Pltfs. Opp. (Dkt. No. 73) at 28-33), Plaintiffs have provided no case law support for that argument.

       Roganti v. Metropolitan Life Ins. Co., 786 F.3d 201 (2d Cir. 2015) – cited by Plaintiffs (id. at 29), does not support Plaintiffs' position.  In that case, the Second Circuit notes that, "[u]nder certain circumstances, it may be arbitrary and capricious for the administrator to reject a claimant's evidence as inadequate without making a reasonable effort to develop the record further."  Roganti, 786 F.3d at 213.  The court further notes, however, that "'[t]he rule is one of reason,' and '[n]othing . . . requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case.'"  Id. (alterations in original) (quoting Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 22 (4th Cir. 2014)); see also O'Reilly v. Hartford Life & Accident Ins. Co., 272 F.3d 955, 961 (7th Cir. 2001) (explaining that ERISA requires a "reasonable inquiry," not a "full-blown investigation" (internal quotation marks omitted)).

The Roganti court went on to reverse a district court's finding that a plan administrator had acted arbitrarily and capriciously in determining that the plaintiff's arbitration award did not constitute "back pay" – and his pension benefits therefore could not be adjusted upward on the basis of the arbitration award – where the plaintiff "offered no direct evidence that the [arbitration] award represent[ed] backpay." Id. at 213, 219.

The Second Circuit explained that

> in cases where the evidence conflicts, an administrator's conclusion drawn from that evidence that a claim should be denied will be upheld unless the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator. . . . Put differently, if the administrator has cited "substantial evidence" in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious.

Id. at 212 (quoting Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 141 (2d Cir. 2010).  The Second Circuit went on to find that the district court had erred in "rel[ying] on cases indicating that a plan administrator acts arbitrarily and capriciously when it denies a claim on the basis of evidence that is significantly weaker than the evidence supporting the claim," because "[i]f [the claimant's] evidence taken alone was inadequate to support his claim (which MetLife rationally found that it was), then MetLife could appropriately deny his claim regardless of the strength of the evidence pointing the other way."  Id. at 216.

Here, the Plan Administrator and Appeal Reviewer carefully considered all of the evidence before them and determined on the basis of that evidence that Plaintiffs had been terminated for poor performance.  As Roganti makes clear, neither the Plan Administrator nor the Appeal Reviewer was required to conduct a "full-blown investigation" of S&P's staffing in New York and other offices to determine whether there was merit to Plaintiffs' speculative claim of a plot by S&P to deprive its workers of their severance pay.  And Roganti further teaches that

even if Plaintiffs had presented "conflicting evidence" showing such a plot – which they did not – the "mere fact" that such evidence had been proffered would not render the determinations by the Plan Administrator and Appeal Reviewer arbitrary and capricious.

Neely v. Pension Tr. Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus., No. 00 Civ. 2013 (SJ), 2004 WL 2851792 (E.D.N.Y. Dec. 8, 2004) – also cited by Plaintiffs (Pltfs. Opp. (Dkt. No. 73) at 29) – is not factually on point.  While Neely states that a "'plan's fiduciary must consider any and all pertinent information reasonably available to him,'" Neely, 2004 WL 2851792 at *8 (quoting Crocco v. Xerox Corp., 956 F. Supp. 129, 139 (D. Conn. 1997), aff'd in relevant part, 137 F.3d 105, 108 (2d Cir. 1998)), the plan administrator in that case had relied on a summary of medical records, without considering the underlying medical records themselves.  See id. at *10.  The court found that a plan administrator's "mere access to documents that they fail, in fact, to consider, falls short of ERISA's requirement of full and fair review as a matter of law."  Id.  Here, by contrast, Plaintiffs do not claim that the Plan Administrator and Appeal Reviewer failed to adequately review the evidence in the record before them.

The remaining cases cited by Plaintiffs (see Pltfs. Opp. (Dkt. No. 73) at 28-29) add nothing to the analysis.  In Ricciardi v. Metro. Life Ins. Co., 2019 U.S. Dist. LEXIS 25240 (S.D.N.Y. Feb. 15, 2019), the court states that plan "administrators may have to make a 'reasonable effort' to further develop the record" where it is "underdeveloped," but also acknowledges that they "are not required to 'scour the countryside in search of evidence to bolster a petitioner's case."  Id. at *23 (quoting Roganti, 786 F.3d at 212-13).

In Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862 F. Supp. 783 (E.D.N.Y. 1994), the court states that a fiduciary's decision is arbitrary and capricious where

the fiduciary "'knew of matters concerning which honesty would require investigation, and failed to act, or if it knew of matters which would honestly compel a given determination and it announced to the contrary.'"  Id. at 789 (quoting Colket v. St. Louis Union Trust Co., 52 F.2d 390, 395-96 (8th Cir. 1931)).  In Rizk, however, the court found a plan administrator's decision arbitrary and capricious where the administrator's "decision to terminate plaintiff's [disability] benefits appear[ed] to be based on an assumption unsupported by any evidence in the record." Id. at 792.

In Magee v. Metro. Life Ins. Co., 632 F. Supp. 2d 308 (S.D.N.Y. 2009), the court found a plan administrator's decision denying disability benefits arbitrary and capricious where that determination was based on flawed analysis and unreliable evidence.  The plan administrator had rejected plaintiff's claim because (1) she had not provided "objective evidence" that she was suffering from an impairment, but no "test" existed for plaintiff's condition; and (2) the file "lacked medical evidence," but the plan administrator did not identify what medical evidence was missing.  Id. at 318-19.  The plan administrator also relied on medical reports that were "seriously flawed," "shoddy and incomplete"; "failed to even consider [plaintiff's] successful Social Security determination, which found [her] subjective complaints credible and supported by objective evidence"; and, without explanation, credited some of the treating physician's opinions, while rejecting others.  Id. at 319-21.

Here, as discussed above, the Plan Administrator and the Appeal Reviewer based their decisions not on speculation or unsupported assumptions, as in Rizk, but on substantial evidence in the record.  See Rizk, 862 F. Supp. at 792.  Moreover, their interpretations of that evidence were "rational" and therefore "must be allowed to control."  Ricciardi, 2019 U.S. Dist. LEXIS 25240, at *23.  Plaintiffs have identified no flaws in the evidence relied upon by the Plan

Administrator and Appeal Reviewer, as was the case in <u>Magee</u>, aside from their unsupported assertions that the complaints about Plaintiffs' work performance were part of a plot to deprive workers of their severance pay.

In sum, the weight of the evidence does not tip "so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator."  <u>Roganti</u>, 786 F.3d at 212.

### b. Alleged Failure to Obtain Evidence Regarding S&P's Policies and Practices Regarding Employee Discipline and Work <u>Performance, and Reliance on Extra-Record Matters</u>

Callas complains that the Appeal Reviewer "failed to attempt to obtain and consider evidence related to [S&P's] policies and practices regarding discipline and performance," and that she "made conclusions based upon evidence that was never put into the record[, citing] her 'understanding and beliefs' related to performance indicators, company disciplinary practice, and restructuring."  (Pltfs. Opp. (Dkt. No. 73) at 30) (quoting AR 1 (Dkt. No. 28) at 49-51)  Callas' arguments are not persuasive.

In his appeal, Callas argued that he had never been placed on a performance improvement plan, and had never been given a disciplinary memorandum or a final warning. Callas further argued that S&P had not offered evidence "that it is a common occurrence that employees be terminated without receiving a PIP[,] . . . [and if] a PIP is a regular practice at S&P, . . . then the lack of a PIP is clear evidence that Mr. Callas did not have performance issues."  (AR 1 (Dkt. No. 28) at 50)  The Appeal Reviewer did not request additional evidence regarding S&P's policies and practices regarding employee discipline and work performance, because she determined that additional evidence regarding these matters would not change her determination:

> [T]here is no Plan requirement that, in order to terminate an employee for unsatisfactory or poor performance, such unsatisfactory or poor performance must last for a specific period of time, that the individual must first be placed on a PIP, that the employee be given a final warning, or even that the individual be informed that the level of their performance is sufficiently poor enough to warrant termination.

(Id.)

While the Appeal Reviewer commented that it was her "understanding that the Company generally does not provide a PIP to employees in senior-level positions, such as the position that Mr. Callas held during his employment with the Company," this point was ultimately irrelevant to the Appeal Reviewer's determination.  (Id.)  The Appeal Reviewer concluded that "[e]ven if an inference could be drawn from the lack of a PIP or written warning, the other contemporaneous documentary evidence . . . of Mr. Daley's displeasure with Mr. Callas' performance clearly rebut such an inference."  (Id.)  In other words, the Appeal Reviewer found that even if Callas' contentions as to S&P's policies and practices were correct, she would still find that Callas' termination was due to his poor work performance.[9]

*     *     *     *

The Court concludes that all three Plaintiffs received a "fair and full review" of their claim for severance pay.

---

[9]  Callas' complaints about the Appeal Reviewer's reference to her "understanding" of S&P's practices relating to Long Term Incentive Plan ("LTIP") awards (Pltfs. Opp. (Dkt. No. 73) at 30; see also AR 1 (Dkt. No. 28) at 49-50) fail for the same reason.  The Appeal Reviewer concludes that, "[e]ven if an inference could be drawn from the granting of the LTIP, the other contemporaneous documentary evidence . . . of Mr. Daley's displeasure with Mr. Callas' performance clearly rebut such an inference."  (AR 1 (Dkt. No. 28) at 50)

### B.      Whether Conflicts of Interest Require that the Administrative Decisions Be Overturned

Plaintiffs argue that the Plan Administrator and Appeal Reviewer had conflicts of interest, and that this Court should "weigh[] such conflict[s] . . . and lessen the degree of deference given to [their] decisions."  (Pltfs. Opp. (Dkt. No. 73) at 24-25)

Plaintiffs do not dispute that the arbitrary and capricious standard, rather than de novo review, applies (see id. at 23), but they argue that this Court should give less deference to the administrative decisions because of the Plan Administrator and Appeal Reviewer's conflicts of interest.  (Id. at 24-25)  This Court agrees that where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as 'a facto[r] in determining whether there is an abuse of discretion.'"  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (alteration in original) (quoting Restatement (Second) of Trusts § 187, Cmt. D (1959)).

Here, however, Plaintiffs have not proffered evidence suggesting that the administrative determinations were influenced by conflicts of interest.  "The plaintiff is required to do more than make conclusory statements that the decision to deny the benefits was affected by a conflict of interest – she actually must show how the conflict affected the reasonableness of the plan administrator's decision."  Gannon, 2007 WL 2844869, at *8.  On this point, Plaintiffs have offered no more than conclusory statements.  There is no evidence that the administrative decisions are irrational, nor is their proof of improper motive.  Indeed, the fact that the Appeal Reviewer requested additional information concerning Plaintiffs' terminations – and gave Plaintiffs an opportunity to address that additional evidence – tends to indicate that the review was "fair and full."

While a "conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, [such as where] an insurance company administrator has a history of biased claims administration[,] . . . [i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." Glenn, 554 U.S. at 117. Here, Defendant has submitted a declaration from Anna Sharkey, the Appeals Reviewer for Plaintiffs' claims, explaining that

> [a]dministration of the Plan at S&P Global operates separately from administration of S&P Global's business. As an example, S&P Global's business and finance departments are completely separate from the administration of the Plan. This ensures independence of the Plan administration process, including the processing of claims for benefits. . . . Neither I nor the Plan Administrator would consult or consider S&P Global's finances in connection with our review of claims for benefits or appeals of claim determinations. . . . Additionally, the compensation of the Plan Administrator and the Appeals Reviewer are not, in any way, tied to whether they uphold or deny claims for benefits under the Plan.

(Sharkey Decl. (Dkt. No. 71) ¶¶ 4-5, 7)

Sharkey further affirms that she "did not consult or consider S&P Global's finances in connection with the determination of Plaintiffs' appeals," and "did not discuss the appeals with any representative from S&P Global's business or finance departments." (Id. ¶¶ 13-14) Sharkey's decisions were instead based on "the information stated in, and the documentation attached to, the determinations of each of the Plaintiffs' appeals." (Id. ¶ 12) Plaintiffs have offered no evidence to the contrary.

## **CONCLUSION**

It was for these reasons that this Court granted Defendant's motion for summary

judgment (Dkt. No. 60).

Dated:   New York, New York
         January 26, 2022

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge